Michael DERDERIAN et al.

v.

ESSEX INSURANCE CO.

No. 2009–358–Appeal.

Supreme Court of Rhode Island.

April 27, 2012.

Thomas M. Dickinson, Esq., Woonsocket, for Plaintiffs.

Joel K. Gerstenblatt, Esq., Warwick, Robert L. Ciociola, Esq. (Admitted Pro Hac Vice), for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The plaintiffs, Michael and Jeffrey Derderian, appeal from the grant of summary judgment in favor of the defendant, Essex Insurance Company (Essex or defendant), in a declaratory-judgment action. The plaintiffs contend that, based on the language of G.L.1956 § 12–28–5 and the pertinent insurance policy, the trial justice erred in concluding that Essex had no duty to defend the plaintiffs against the state's criminal prosecutions of them on charges of involuntary manslaughter. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

The tragic facts underlying this case are painfully well known to all Rhode Islanders. On February 20, 2003, in the Town of West Warwick, one hundred people perished in a fire that occurred at the Station nightclub, which was co-owned by Michael and Jeffrey Derderian. The inferno engulfed the Station within a matter of minutes when polyurethane foam covering the ceiling and walls caught fire after a band performing at the nightclub ignited a pyrotechnic display. The foam that kindled the conflagration had been installed by the Derderians in June 2000, and was not flame-resistant, as required by the statute in effect at that time, namely, G.L.1956 § 23–28.6–15(a).[1]

In relation to this catastrophe, a grand jury returned separate criminal indictments against plaintiffs. Counts 1

1. Although G.L.1956 § 23–28.6–15(a) was repealed by the General Assembly in 2004, the statute was in effect during the 2000–2003 time period at issue in this case, and stated, in pertinent part, that "[a]ll combustible decorative and acoustical material * * * shall be rendered and maintained flame resistant * * *." The later repeal of this statute has no bearing on the outcome of this case.

through 100 of the respective indictments alleged that the Derderians, "without malice aforethought, perform[ed] a lawful act with criminal negligence, * * * which on February 20, 2003 unintentionally and proximately caused the death of [the victims], in violation of [G.L.1956] § 11–23–3 * * *."[2] Counts 101 through 200 alleged that the Derderians, "without malice aforethought, perform[ed] an unlawful act not amounting to a felony, to wit, the violation of § 23–28.6–15 * * * which unintentionally and proximately caused the death of [the victims] in violation of § 11–23–3 * * *."

Prior to this devastating event, Essex had issued an insurance policy (policy) to Michael Derderian. The policy named the insured as "The Station, c/o Michael Derderian" and was effective from March 24, 2002, until March 24, 2003, a time during which the tragedy at the Station occurred. The "Insuring Agreement" within the policy stated:

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.
"* * *

"No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments— Coverage A and B.

"b. This insurance applies to 'bodily injury' and 'property damage' only if:

"(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and

"(2) The 'bodily injury' or 'property damage' occurs during the policy period.

"c. Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury'."

The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and it defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." "Suit" was defined in the policy as "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." The policy expounded that the term "suit" also included "[a]n arbitration proceeding in which such damages are claimed * * * [and] [a]ny other alternative dispute resolution proceeding in which such damages are claimed * * *." Further, the "combination general endorsement" to the policy stated: "Where there is no coverage under this policy, there is no duty to defend."

The Derderians demanded, pursuant to the policy and § 12–28–5,[3] that Essex af-

---

2. General Laws 1956 § 11–23–3(a) states that "[e]very person who shall commit manslaughter shall be imprisoned not exceeding thirty (30) years."

3. General Laws 1956 § 12–28–5 is a section of the "Victim's Rights" statute, which states:
"(a) Upon his or her final conviction of a felony after a trial by jury, a civil judgment

ford them a defense against the criminal prosecutions arising from the grand jury indictments. Essex, however, refused to provide a defense for the Derderians against the criminal charges, arguing that it was not obligated under either the policy or § 12–28–5 to do so. In response to Essex's rejection of their request, the Derderians filed a complaint against Essex on June 28, 2004, seeking a declaratory judgment that the grand jury indictments against them "constitute[d] a 'suit' as defined in the Essex [p]olicy" and that, accordingly, "Essex ha[d] a duty to provide [the] Derderian[s] with a defense" in the related criminal proceedings. The complaint ascribed that "[b]ecause a verdict against each defendant in the indictments would result in the imposition of civil judgment for liability and damages as provided in § 12–28–5, each indictment constitute[d] a 'suit' under the terms of the Essex policy."

On August 17, 2004, Essex filed an answer denying the allegations set forth in the Derderians' complaint and a counterclaim seeking a declaration that Essex had no duty to defend the Derderians in rela-tion to their criminal prosecutions. The Derderians filed an answer to Essex's counterclaim on September 8, 2004; and, on November 2, 2007, they filed a motion for summary judgment.[4] On December 20, 2007, Essex filed a cross-motion for summary judgment, and a hearing on the motions was held on March 6, 2009. Thereafter, the hearing justice issued a written decision; and, on July 8, 2009, a judgment was entered granting Essex's motion for summary judgment and denying the Derderians' motion. Both Michael and Jeffrey Derderian jointly filed a timely notice of appeal on July 28, 2009.

## II

### Standard of Review

■■■■ "In reviewing the parties' cross-motions for summary judgment, we examine the matter *de novo*." *Travelers Property and Casualty Corp. v. Old Republic Insurance Co.*, 847 A.2d 303, 307 (R.I. 2004). "Summary judgment is appropriate when, viewing the facts and all reasonable inferences therefrom in the light most fa-

shall automatically be entered by the trial court against the defendant conclusively establishing his or her liability to the victim for any personal injury and/or loss of property that was sustained by the victim as a direct and proximate cause of the felonious conduct of which the defendant has been convicted. The court shall notify the victim at his or her last known address of the entry of the civil judgment in his or her favor and inform him or her that he or she must establish proof of damages in an appropriate judicial proceeding in order to recover for his or her injury or loss. This section shall not apply to crimes set forth in title 31 arising from the operation of a motor vehicle.

"(b) For the purposes of this section, 'victim' is one who has sustained personal injury or loss of property directly attributable to the felonious conduct of which the defendant has been convicted. In homicide cases, judgment shall enter for the benefit of those parties eligible to commence a wrongful death action pursuant to chapter 7 of title 10."

4. On September 29, 2006, Michael and Jeffrey Derderian pled nolo contendere to 100 counts of involuntary manslaughter, "pursuant to the theory of misdemeanor manslaughter." As a result of this plea, Jeffrey was sentenced to ten years at the Adult Correctional Institutions (ACI), suspended, with three years of probation, and was ordered to complete 500 hours of community service. Michael was sentenced to fifteen years at the ACI, with four years to serve in minimum security, eleven years suspended, with three years of probation. Additionally, Michael was ordered into a work-release program approved by the Department of Corrections. All other criminal counts against the Derderians were dismissed with prejudice.

vorable to the nonmoving party, the [C]ourt determines that there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Delta Airlines, Inc. v. Neary,* 785 A.2d 1123, 1126 (R.I.2001)).

■ "An insurance policy is contractual in nature," *Papudesu v. Medical Malpractice Joint Underwriting Association of Rhode Island,* 18 A.3d 495, 498 (R.I. 2011), and we interpret insurance policy terms in accordance to the rules of construction that govern contracts. *Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.,* 860 A.2d 1210, 1215 (R.I.2004). "[T]he existence of ambiguity *vel non* in a contract is an issue of law to be determined by the [C]ourt." *Papudesu,* 18 A.3d at 497 (quoting *Gorman v. Gorman,* 883 A.2d 732, 738 n. 8 (R.I.2005)). "When a contract is unambiguous, we review its terms in a *de novo* manner." *Id.* at 498. Only when the insurance policy's terms are ambiguous will this Court depart from the literal language of the policy; and, upon such a determination, "the policy will be strictly construed in favor of the insured and against the insurer." *Sjogren v. Metropolitan Property and Casualty Insurance Co.,* 703 A.2d 608, 610 (R.I.1997).

## III

### Discussion

On appeal, the Derderians argue that the trial justice erred by concluding that Essex had no duty to defend them against the state's criminal prosecutions of them on charges of involuntary manslaughter.[5] To support their contention, the Derderi-

ans assert that the trial justice erred in her interpretation of the word "suit," as used within the policy. The plaintiffs educe that because the trial justice incorrectly interpreted this term, she also erred by holding that Essex did not have a duty to defend the Derderians against the criminal negligence charges.

■ "In general, the duty to defend an insured in this jurisdiction is determined by applying the 'pleadings test.'" *Peerless Insurance Co. v. Viegas,* 667 A.2d 785, 787 (R.I.1995) (quoting *The Employers' Fire Insurance Co. v. Beals,* 103 R.I. 623, 632, 240 A.2d 397, 402 (1968)). "That test requires the trial court to look at the allegations contained in the complaint, and 'if the pleadings recite facts bringing the injury complained of within the coverage of the insurance policy, the insurer must defend irrespective of the insured's ultimate liability to the plaintiff'" *Id.* (quoting *Beals,* 103 R.I. at 632, 240 A.2d at 402). We begin our analysis by examining the contractual language of the policy.

### A

### The Term "Suit" as Defined by the Essex Policy

■ The term "suit" specifically was defined within the policy to mean "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." The policy declared that Essex "will have the right and duty to defend the insured against any 'suit' seeking those damages," but further proclaimed that Essex "will have no duty to defend the insured against any 'suit'

---

5. The plaintiffs additionally argue on appeal that it would not violate public policy were this Court to hold that Essex was required to provide a defense against the criminal charges in accordance with § 12–28–5. We need not reach the public-policy issue, however, because of our determination that Essex, under the policy at issue, was not required to provide such a defense to the Derderians in their criminal proceedings.

seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."

The plaintiffs contend that, for purposes of imposing a duty to defend, the word "suit" should be interpreted broadly. They argue that, under § 12–28–5, any criminal prosecution within the scope of the statute is, in effect, a proceeding that can lead to a civil judgment, thereby triggering Essex's duty to defend. The defendant, however, argues that the policy clearly defined the term "suit" as "a civil proceeding," and as such, that "[t]he plain language of the [p]olicy * * * is clear and unambiguous."

■■■■■ "To determine whether the policy is ambiguous, we give words their plain, ordinary, and usual meaning." *Bliss Mine Road Condominium Association v. Nationwide Property and Casualty Insurance Co.*, 11 A.3d 1078, 1083 (R.I.2010). The subjective intent of the parties may not properly be considered by the Court; rather, we "consider the intent expressed by the language of the contract." *Id.* at 1083–84. "The Court considers the policy in its entirety and does not 'establish ambiguity by viewing a word in isolation or by taking a phrase out of context.'" *Id.* at 1083 (quoting *Amica Mutual Insurance Co. v. Streicker*, 583 A.2d 550, 552 (R.I. 1990)). Furthermore, we will "refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present." *Id.* (quoting *Mallane v. Holyoke Mutual Insurance Co. in Salem*, 658 A.2d 18, 20 (R.I.1995)).

The policy explicitly defined the term "suit" as "a *civil* proceeding." (Emphasis added.) The legal term "civil" is defined in Black's Law Dictionary 279 (9th ed.2009) as "[o]f or relating to private rights and remedies that are sought by action or suit, *as distinct from criminal*

*proceedings.*" (Emphasis added.) A "suit of a civil nature" is defined as "[a] civil action," *id.* at 1572, and a "civil action" is defined as "[a]n action brought to enforce, redress, or protect a private or civil right; a *noncriminal* litigation." *Id.* at 1572 (emphasis added). The Derderians were charged with involuntary manslaughter under the *criminal* offense of homicide. *See* § 11–23–3. Clearly, on its face, the criminal indictments, which cited charges of involuntary manslaughter, do not comport with the term "suit" as it was used and defined in the policy. We decline, therefore, to interpret the word "suit" more broadly than it was unequivocally defined within the policy itself. Thus, we are satisfied Essex's duty extended only to civil proceedings and not to criminal proceedings.

## B

### Duty to Defend Pursuant to § 12–28–5

■■■■ Although the term "suit," as defined within the policy, excluded Essex's duty to defend in criminal proceedings, the Derderians argue that the grand jury indictments against them "presented the possibility of a civil judgment for personal injury * * * in connection with the allegations of [criminal] negligence against them" under § 12–28–5, and thus, qualified as a "suit" under the policy.

To support their theory, the Derderians contend that the explicit language of § 12–28–5, combined with this Court's holding in *Seddon v. Bonner*, 755 A.2d 823, 827 (R.I. 2000), "could not be more clear" that a felony conviction after a jury trial results in an "automatic" civil judgment. As such, plaintiffs argue that "this statute converts a conviction in a criminal case into an automatic civil judgment for liability in favor of the victim, without the necessity of any further notice, hearing or proceed-

ings." For that reason, plaintiffs conclude that, according to the policy's terms, each criminal indictment brought against them constituted a "suit" demanding coverage under the policy. Therefore, the Derderians "submit that the policy in this case clearly required Essex to defend them [in their criminal prosecutions]."

Adversely, Essex argues that "[t]he contractual language of the Essex [p]olicy precludes any finding of coverage for criminal defense costs." In support, Essex first postulates that "[t]he indictments against the Derderians alleged involuntary manslaughter * * *, but did not initiate a civil proceeding or allege damages." Second, defendant emphasizes that "[t]here is absolutely no indication that the General Assembly, by enacting [§ 12–28–5], intended to radically rewrite the long-standing law of liability-insurance coverage by turning criminal prosecutions into civil lawsuits for 'damages' for 'bodily injury' or 'property damage.'" Third, Essex asserts that "interpreting the statute as sought by the Derderians would create a windfall whose benefits would flow solely to alleged perpetrators of crimes and would completely rewrite all general liability insurance contracts by adding a coverage grant never contemplated, let alone bargained for by insurers or their insureds." Criminal and civil proceedings, Essex maintains, remain two separate proceedings regardless of whether § 12–28–5 is pursued, and therefore, "[t]he Derderians' proffered interpretation of § 12–28–5 is a novel distortion of the statute, advanced in derogation of its stated purposes."

We are wholly satisfied that the underlying criminal indictments against the Derderians, which alleged involuntary manslaughter, neither initiated a civil proceeding nor alleged damages. *See Hoyle v. Utica Mutual Insurance Co.,* 137 Idaho 367, 48 P.3d 1256, 1263 (2002) (holding that, even when the state seeks restitution from a defendant in a criminal action, the criminal case does not constitute a suit for damages); *Spiegel v. State Farm Fire and Casualty Co.,* 277 Ill.App.3d 340, 214 Ill. Dec. 9, 660 N.E.2d 200, 202 (1995) (declining to address "the issue of whether restitution constitutes damages under [the] plaintiff's insurance policy" where the plaintiff "produced no evidence suggesting that restitution was sought in the criminal battery complaint * * * filed against him"); *Shelter Mutual Insurance Co. v. Bailey,* 160 Ill.App.3d 146, 112 Ill.Dec. 76, 513 N.E.2d 490, 497 (1987) (stating that "[a] criminal complaint does not seek damages [because] [i]t is penal in nature").

Nor do we attribute to the General Assembly an intent to transform criminal prosecutions into civil proceedings by enacting § 12–28–5. Section 5 is embedded in chapter 28 of title 12, known as the "Victim's Bill of Rights," § 12–28–1, of which the express purpose "is to ensure that all victims of crime are treated with respect and receive financial compensation for their losses."[6] *State v. LaRoche,* 925

---

6. We also note that in § 12–28–5(a), the General Assembly specifically excluded crimes "arising from the operation of a motor vehicle." Considering that the express purpose of chapter 28 of title 12 is to ensure "[t]hat whenever possible [victims of crime] receive financial compensation for their injury or loss from the perpetrator of the crime," § 12–28–2(2), this Court presumes the motor vehicle exclusion was due, at least in part, to the fact that motor vehicle accidents are generally covered by insurance. *See Mendez v. Brites,* 849 A.2d 329, 336 (R.I.2004) ("Rhode Island law * * * requires all motorists that use Rhode Island highways * * * to carry adequate liability insurance on their vehicles"). Similar to § 12–28–5, the General Assembly enacted G.L.1956 § 31–47–1 with the express intent to ensure that "innocent victims of motor vehicle accidents may be recompensed for the injury and financial loss inflicted upon them." Both § 31–47–1 and § 12–28–5 were

A.2d 885, 887, 889 (R.I.2007); see § 12–28–1; § 12–28–2. As this Court has previously observed, § 12–28–5 is merely a "procedural mechanism" to conclusively establish the liability of the defendant for personal injury or loss of property, and a further proceeding is required under the statute to determine the amount of damages. *Seddon*, 755 A.2d at 826. It is our opinion, therefore, that the plaintiffs' reliance on § 12–28–5 is unavailing.

## IV

### Conclusion

The Essex policy described the obligations of Essex, as the insurer, and the rights of the Derderians, as the insureds. A thorough reading of the policy convinces this Court that the parties' clear intention when entering into the contract was that Essex would provide the Derderians with a defense only in civil proceedings in which bodily injury or property damage were alleged. Unlike the alchemists of yore, we do not claim the ability to transmute base metal into gold; neither can we transmute a 200–count criminal indictment into a civil proceeding. It is our opinion, therefore, that Essex had no duty to defend the plaintiffs in their criminal prosecutions.

For the reasons set forth in this opinion, we are satisfied that the trial justice did not err in granting Essex's cross-motion for summary judgment and denying the Derderians' motion. In accordance with the foregoing, we affirm the judgment of the Superior Court. We remand the papers in this case to the Superior Court.

enacted to protect the "victims," not the person accused of inflicting the injury or damage. As such, we reasonably can conclude that § 12–28–5 was not meant, as the Derderians would have it, to require an insurance company to provide an alleged perpetrator of the crime with the benefit of a defense in a related criminal proceeding.