Quest Diagnostics, LLC           :

v.                               :

Pinnacle Consortium of Higher Education, a   :
 Vermont Reciprocal Risk Retention Group
et al.

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2013-108-Appeal.
(PC 11-6410)
(Concurrence begins on page 11)

Quest Diagnostics, LLC       :

v.       :

Pinnacle Consortium of Higher Education, a   :
  Vermont Reciprocal Risk Retention Group
et al.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The plaintiff, Quest Diagnostics, LLC (Quest),

appeals from the Superior Court's grant of summary judgment in favor of the defendants,

Pinnacle Consortium of Higher Education, a Vermont Reciprocal Risk Retention Group

(Pinnacle), and Genesis Insurance Company (Genesis) in this insurance coverage dispute.

The plaintiff asserts that the hearing justice erred in denying its motion for summary

judgment and in granting defendants' motions for summary judgment. Specifically, plaintiff

argues that: (1) it is covered as an insured under the Pinnacle general liability policy; (2) it is

covered under the professional liability coverage section of the Pinnacle policy; (3) it is covered

under the pertinent Genesis excess coverage policy; and (4) both Pinnacle and Genesis breached

their duties to defend and waived their rights to deny coverage because they did not respond to

plaintiff's demand for defense in a reasonably timely manner. For the reasons set forth in this

opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

Brown University and Quest entered into a Professional Services Agreement (PSA), in which Brown retained Quest as an independent contractor, responsible for performing "certain clinical laboratory testing for students and employees" at the Brown University health center. The PSA set forth policies for the performance of certain tests, and required both parties to procure four types of insurance coverage: workers' compensation insurance, general liability insurance, "All Risk" property insurance, and professional liability insurance. Notably, the agreement obligated both to name the other party as an additional insured under their general liability policies; there was no requirement that they do so for any of the other types of insurance. Brown secured insurance through Pinnacle and excess insurance through Genesis.

On May 10, 2006, Pauline Hall, a graduate student at Brown University, sought treatment at the university's health services clinic. At the time, Ms. Hall was experiencing a sore throat, nausea, and ear pain. She was seen by Rita Shiff, a physician's assistant who was employed by Brown. Ms. Shiff ordered a rapid strep test, to be performed by Quest. The test was not performed promptly, and results were not returned to the health center.[1] When Ms. Hall returned to the health center on May 12, 2006, she was diagnosed with toxic shock syndrome—an illness that resulted in a prolonged hospital stay and permanent injuries.

---

[1] Precisely how the test went astray is a matter of some dispute. Brown argues that Quest violated the policies set forth in the Professional Services Agreement (PSA) by failing to send the test sample to the nearest facility and, as a result, the test was not performed. Quest argues that the error was caused by a Brown employee who was covering the Quest desk during lunch.

On June 26, 2006, Brown notified Pinnacle and Quest of the incident and the potential claim arising from it.[2] On March 24, 2008, Ms. Hall filed suit in Superior Court against Ms. Shiff, Brown, and Quest, alleging, inter alia, that Quest failed to exercise the "degree and skill expected of [a] reasonably competent provider of laboratory services" in failing to process the test and in failing to provide the results of the testing in a timely manner. On December 10, 2010, Brown and Ms. Shiff filed a cross-claim against Quest, alleging that Quest negligently failed to "properly process the Rapid Strep test, * * * and to communicate the results" of the test to the health center. In addition to the negligence claim, Brown asserted claims for breach of contract, indemnification, and contribution.

On May 4, 2011, Ms. Hall settled her claims with Brown and its insurers, Pinnacle and Genesis. Quest did not participate in the settlement, and the Brown cross-claim was not resolved. On July 15, 2011, Quest sent a letter to Brown's counsel, demanding, for the first time, "a complete defense and indemnification from Pinnacle," and requesting that Brown's counsel forward the letter to Pinnacle and provide the relevant contact information to Quest. When Quest did not receive a reply, it sent a follow-up letter on July 27, 2011. Genesis, the excess insurer, never received a copy of these letters.

On November 7, 2011, Quest filed the instant action, seeking a declaratory judgment that it was entitled to a defense from Pinnacle and indemnification under the Pinnacle and Genesis policies. On May 11, 2012, Quest filed a motion for summary judgment; Pinnacle and Genesis each opposed the motion and filed their own motions for summary judgment.

---

[2] This letter, giving Pinnacle written notice of a potential claim, triggered the 2005/2006 policy year as the operant policy year for this dispute. Accordingly, there is no need to consider any later policies.

A hearing was held on February 5, 2013; on March 14, 2013, the hearing justice issued a written decision denying Quest's motion for summary judgment and granting summary judgment to Pinnacle and Genesis, declaring that Quest was not entitled to defense and indemnification from either insurer. Judgment was entered on March 19, 2013, and Quest timely appealed. Further facts will be provided as necessary to discuss the issues raised on appeal.

## II

## Standard of Review

"In reviewing the parties' cross-motions for summary judgment, we examine the matter de novo." Peloquin v. Haven Health Center of Greenville, LLC, 61 A.3d 419, 424 (R.I. 2013) (quoting Derderian v. Essex Insurance Co., 44 A.3d 122, 126 (R.I. 2012)). "In reviewing the Superior Court's judgment on the parties' motions for summary judgment, we * * * apply the same standards as those used by the trial court." Id. (quoting Delta Airlines, Inc. v. Neary, 785 A.2d 1123, 1126 (R.I. 2001)). "Thus, '[s]ummary judgment is appropriate when, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the [C]ourt determines that there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.'" Id. at 424-25 (quoting Derderian, 44 A.3d at 126-27).

## III

## Discussion

On appeal, Quest argues that it is covered as an insured under the Pinnacle policy, under both its general liability and professional liability sections. Quest also asserts that it is covered under a 2010/2011 excess policy issued by Genesis. Finally, Quest argues that both defendants waived their rights to deny coverage by not responding to its demand for defense in a reasonably timely manner. All parties agree that Quest had contracted with Brown to provide clinical

laboratory testing, and that the PSA that memorialized their agreement also required both parties to obtain general liability insurance, upon which each would name the other as an additional insured. Further, both Quest and Brown were required to obtain professional liability coverage, but there was no obligation to name the other party as an additional insured. Brown obtained both general liability and professional liability insurance from Pinnacle.[3] At issue is whether Quest is covered by a policy relative to the allegations contained in the underlying action and in Brown's cross-complaint.

Brown University is the named insured on the Pinnacle policy; the policy includes the following language in Endorsement 4:

> "It is agreed that the 'Who is an Insured' provision of All Coverage Parts are amended to include:
>
> " * * *
>
> "(d) At the option of the Named Insured shown on the declarations page of this policy, any person, corporation, company, organization, estate or other entity but only to the extent the Named Insured has agreed to do so."

Thus, because the PSA is the basis of the agreement to extend coverage to Quest as an additional insured, we must construe the PSA and the Pinnacle policy together, in order to determine the extent to which Quest may be entitled to coverage. See Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996) ("[I]nstruments referred to in a written contract may be regarded as incorporated by reference and thus may be considered in the construction of the contract.").

Turning first to the PSA, the relevant portion reads:

> "2.6 [Quest] and [Brown] shall purchase and maintain at their sole expense and with an insurance company or through self-insurance

---

[3] It is not clear from the record whether Quest obtained the necessary insurance or from whom the insurance may have been obtained.

the following insurance coverage and limits: (i) Worker's Compensation (covering [Quest's] employees) to statutory limits; (ii) Comprehensive General Liability Insurance for injuries to persons and property occurring at the SITE or as a result of this Agreement in the amount of at leas[t] ONE MILLION DOLLARS ($1,000,000.00) per occurrence and TWO MILLION DOLLARS ($2,000,000.00) aggregate. In addition, the Certificate(s) of Insurance shall name [Brown] or [Quest] as an 'Additional Insured'; (iii) 'All Risk' Property Insurance, insuring against damage to or loss of any property, to its full insurable value, of [Quest] and [Brown], its officers, servants, employees, agents, licensees, or any person or entity claiming by, through or under [Quest] and [Brown] located on the premises, and, if available such insurance shall contain a waiver of any right of subrogation which such insurance carrier might have against [Brown] or [Quest], its servants, or invitees, and (iv) Professional Liability Insurance, insuring against medical malpractice and other liability which may arise as a result of [Quest's] or [Brown health center's] profession and/or business in an amount of not less than ONE MILLION DOLLARS ($1,000,000). Such policies shall contain a provision(s) to the effect that they may not be cancelled or coverage materially altered without at least thirty (30) days' advance written notice to [Brown]."

The PSA is clear and unambiguous in requiring Quest and Brown to name one another as additional insureds only under their respective general liability insurance coverage.

Brown obtained general liability coverage and professional liability coverage from Pinnacle. This coverage was packaged together under one policy number. Pinnacle asserts that Quest is covered only under the general liability provisions, which are inapplicable to the claims asserted in the underlying action and cross-claim. Quest concedes that there are two coverages, but argues that there is only one policy with one policy number; thus Quest asserts that it is an additional insured under all of the coverage parts.

Although it appears (and Pinnacle concedes) that Quest is a named insured under the general liability coverage, there are two dozen numbered endorsements that modify coverage;

two of these endorsements are pertinent to this dispute. After referencing the section of Coverage A that covers bodily injury, Endorsement No. 7 modifies that provision, stating:

> "COMMERCIAL GENERAL LIABILITY COVERAGE FORM
> "INCIDENTAL MALPRACTICE COVERAGE/HOSPITAL
> PROFESSIONAL LIABILITY EXCLUSION
>
> " * * *
>
> "However, this policy does not apply to bodily injury arising out of the following activities or services conducted at or performed in a hospital setting or a Student/Employee Healthcare Facility:
>
> > "1. The rendering of or failure to render:
> >
> > "(a) Medical, surgical, dental, x-ray, or nursing service or treatment, or the furnishing of food or beverages in connection therewith; or
> >
> > "(b) any service or treatment conducive to health or of a professional nature; or
> >
> > "(c) any cosmetic or tonsorial service or treatment."

Brown's cross-claim, based on the allegations in Ms. Hall's complaint, unambiguously alleges a cause of action that arose from Quest's negligence in failing to perform a test—certainly a service conducive to health—in a manner consistent with that of a "reasonably competent provider of laboratory services," which is the standard of care in any professional liability action. See Restatement (Second) Torts § 299A at 73 (1965) ("[O]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing * * * ."). Endorsement 7, therefore, specifically excludes coverage for Quest with regard to professional liability under the general liability coverage of the Pinnacle policy.

Quest argues that Ms. Hall's injury did not arise from, or at least not entirely from, services performed at the health center because the failure to perform a rapid strep test occurred

- 7 -

offsite, at one of Quest's other testing facilities. However, the action that allegedly led directly to Ms. Hall's injury—the placing of her test sample in the wrong bag, thus sending it to the wrong facility—occurred at the health center. The allegations that Quest failed to test promptly, and to notify Brown as required by the PSA, all flow from that first error. Accordingly, the actions alleged in the initial complaint and in Brown's cross-complaint fall squarely within Endorsement 7, excluding professional liability coverage from the general liability coverage.

Quest further argues that the conduct at issue was not professional, but merely administrative. This argument is unavailing. Brown contracted with Quest for the professional service of providing clinical laboratory testing. The contract is entitled "Professional Services Agreement," thus clearly indicating that Quest was to perform services "of a professional nature." Just as doctors spend time charting, and lawyers scheduling, professional services necessarily include a number of administrative tasks. The PSA specifically includes some of these tasks, requiring Quest to provide courier service, report STAT test results within one to three hours of receipt of the test, and fax results when completed. Accordingly, all aspects of testing, including routing the sample to the appropriate laboratory, are a professional service and are excluded from the general liability coverage in the Pinnacle policy.[4]

Quest next argues that it is an additional insured under the professional liability coverage offered by Pinnacle. Endorsement 17 provides coverage for professional liability on a claims-made basis and contains the following exclusion:

---

[4] In Ho Rath v. Rhode Island Hospital, 89 A.3d 806 (R.I. 2014), a case involving the statute of limitations for medical malpractice actions, we opined that laboratories such as Quest are not included within this state's statutory definition of medical malpractice. See G.L. 1956 § 5-37-1(8). In the instant case, however, the specific language agreed to in the contractual PSA provides an arguably broader basis than the narrower language in the medical malpractice statute.

"1. This coverage does not apply to:

"A. Any claim for bodily injury, sickness, disease or death of any person; but this exclusion shall not apply if such bodily injury, sickness, disease or death is a result of any act, error or omission committed in a student/employee health care facility subsequent to 7/1/80 as a result of the following:

"1. The rendering of or failure to render:
"(a) medical, surgical, dental, x-ray, or nursing service or treatment or furnishing of food or beverages in connection therewith; or
"(b) any service or treatment conducive to health or of a professional nature; or
"(c) any cosmetic or tonsorial service or treatment."

Thus, Endorsement 17 covers the activities that are specifically excluded from the general liability coverage in Endorsement 7. Quest contends that because it is an additional insured under Pinnacle's policy, it is therefore an additional insured under all coverage parts of the policy.

To adopt Quest's reading of the policy would be to ignore the plain meaning of Endorsement 4, which defines an additional insured as "any person, corporation, company, organization, estate or other entity but only to the extent the Named Insured has agreed to do so." (Emphasis added.) The source of Brown's assent to coverage of Quest as an additional insured is found in the PSA, in which Brown agrees to name Quest as an additional insured on its general liability coverage. There is no requirement, nor is there any agreement to be found, that Brown provide professional liability coverage to Quest. As we previously have stated, "We do not engage in mental gymnastics * * * to read ambiguity into a policy where none is present." Peloquin, 61 A.3d at 432 (quoting Sjogren v. Metropolitan Property and Casualty Insurance Co., 703 A.2d 608, 610 (R.I. 1997)). Having carefully examined the policy and the PSA from which

it stems, we cannot conclude that Brown gratuitously obtained professional liability insurance for its independent contractor in addition to the coverage it obtained for itself.

The language of the PSA and the Pinnacle policy is clear and unambiguous—although Quest is an additional insured under the general liability coverage, it is not an insured under the professional liability coverage. Because the claims against Quest allege professional negligence, they fall within the purview of professional liability insurance and the PSA. Accordingly, Pinnacle has no duty to defend nor to indemnify Quest in this action.

Quest also argues that it qualifies for excess coverage from Genesis under its 2010/2011 policy. We need not address whether coverage under this latter policy is even relevant given the date of Ms. Hall's claim, because Genesis's Commercial Excess Policy coverage is predicated on the existence of coverage flowing from the underlying Pinnacle policy. The Genesis policy defines an insured in a similar manner to the Pinnacle policy, extending insured status to entities "only to the extent the 'Named Insured' [Brown] has agreed to do so in writing prior to an occurrence." Because there was no agreement to name Quest as an additional insured for purposes of professional liability coverage, for the reasons stated above, Quest is not an insured for professional liability under the Genesis policy.

Finally, Quest argues that Pinnacle and Genesis waived their rights to deny coverage by not responding to Quest's demand for coverage in a timely manner. Because the claim against Quest for general liability was not covered, and Quest was not an insured under the professional liability section, neither Pinnacle nor Genesis had a duty to defend it. Absent such duty, estoppel cannot be employed to expand coverage to Quest. "The relevant cases are clear * * * that the doctrine of estoppel cannot be used to enlarge coverage beyond that which is set out in the

policy." <u>General Accident Insurance Co. of America v. American National Fireproofing, Inc.</u>, 716 A.2d 751, 755 (R.I. 1998).

**IV**

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court. The record of this case shall be returned to the Superior Court.

**Justice Robinson, concurring.** After long hesitation, I have now concluded that I am able to concur with the result reached by the majority in this exceedingly difficult case, although the route that I have traveled to reach that conclusion is somewhat different from that traveled by the majority.[5]

I begin by stating that it is patent (in my opinion) that the insurance policy at issue (a document which bears just one policy number for what is arguably two policies) is internally inconsistent and, therefore, ambiguous. It has been this Court's holding that "an agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation." <u>W.P. Associates v. Forcier, Inc.</u>, 637 A.2d 353, 356 (R.I. 1994); <u>see</u> <u>Isbrandtsen v. North Branch Corp.</u>, 556 A.2d 81, 84 (Vt. 1988) ("Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable."); <u>see also</u> <u>Lynch v. Spirit Rent-A-Car, Inc.</u>, 965 A.2d 417, 425 (R.I. 2009); <u>see generally</u> Steven W. Feldman & James A. DeLanis, <u>Resolving Contractual Ambiguity in Tennessee: A Systematic Approach</u>, 68 Tenn. L. Rev. 73, 88 (2000). It is my considered opinion that, when looking at the language of

---

[5]  Nothing that I say in this concurrence should be understood as suggesting that the analysis contained in the majority opinion is less than scholarly.

Endorsement 4, Endorsement 7, and Endorsement 17 of the insurance contract at issue in this case, one could reasonably come to the conclusion that the insurance contract was intended to be one policy, with Quest being an additional insured for all terms in the policy (including Endorsement 17) because Quest falls within the language of Endorsement 4. However, one could also make a reasonable determination, based on the same language, that Endorsement 17 was intended to be a separate policy under which Quest was not an additional insured. Thus, the insurance contract is ambiguous. See Lynch, 965 A.2d at 425.

I recognize that there is precedent which would support the principle that, if the insurance contract is ambiguous, it must be construed against the insurance company (i.e., the contra proferentem canon of construction). See, e.g., Koziol v. Peerless Insurance Co., 41 A.3d 647, 651 (R.I. 2012) ("An ambiguity in an insurance policy is strictly construed against the insurer."); Elliott Leases Cars, Inc. v. Quigley, 118 R.I. 321, 328, 373 A.2d 810, 813 (1977) (noting that this Court has "in the past characterized [insurance contracts] as contracts of adhesion" and stating that "[i]t is well-established that ambiguities [in an insurance contract] will be construed so as to bear most heavily against the insurer"). However, that is simply one canon of construction and not the one which, in my opinion, is most properly applicable in the instant case. See Payless Shoesource, Inc. v. Travelers Companies, Inc., 585 F.3d 1366, 1372 (10th Cir. 2009). "[A]s every judge knows, the canons of construction are many and their interaction complex. The canons are not mandatory rules." Xilinx, Inc. v. Commissioner of Internal Revenue, 598 F.3d 1191, 1196 (9th Cir. 2010) (internal quotation marks omitted); see also Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001) ("For one thing, canons are not mandatory rules. They are guides that need not be conclusive.") (internal quotation marks

omitted). Indeed, with respect to the <u>contra</u> <u>proferentem</u> canon itself, the United States Court of Appeals for the Tenth Circuit has aptly stated:

> "The sensibility of the <u>contra</u> <u>proferentem</u> canon of construction * * * rests in large measure on an assumption of unequal bargaining strength between the seller and purchaser, * * * supposing as it does the prototypical case of a large insurance company essentially dictating its terms in an adhesion contract to individuals with relatively little bargaining power. It is less clear whether and to what degree the doctrine has an appropriate role to play when the contracting parties are as sophisticated and able as [the companies involved in the case] both assuredly are." <u>Payless Shoesource, Inc.</u>, 585 F.3d at 1372 (internal quotation marks omitted); see <u>also</u> <u>Wood River Pipeline Co. v. Willbros Energy Services Co.</u>, 738 P.2d 866, 872 (Kan. 1987) ("The principle that doubtful language in a contract is construed against the drafter is of little consequence * * * [when the] clauses were bargained for by two large and sophisticated companies of equal bargaining power, each acting through experienced persons.").

In the instant case, where all of the involved parties are large, sophisticated entities which have ample experience with insurance contracts, it simply is not just[6] to strictly construe the Pinnacle policy against Pinnacle; there is no evidence that the Pinnacle policy is a contract of adhesion, nor that it would result in any of the inequities which the canon of <u>contra</u> <u>proferentem</u> was intended to prevent. While the <u>contra</u> <u>proferentem</u> canon can be an important tool in dealing with ambiguous contractual language, we should not, in this rather unusual case, have resort to that principle because the fog of ambiguity that otherwise envelops the Pinnacle policy can be dispelled by referring to extrinsic evidence—namely, the PSA entered into by Quest and Brown. See <u>W.P. Associates</u>, 637 A.2d at 356 ("If a document is susceptible to more than one interpretation, extrinsic evidence is admissible to aid in its interpretation.").

---

[6] See Harry G. Prince, <u>Contract Interpretation in California: Plain Meaning, Parol Evidence and Use of the "Just Result" Principle</u>, 31 Loy. L.A. L. Rev. 557, 650-51 (1998) ("In situations where the contract does not provide an answer, the concerns of justice should certainly be relevant to contract interpretation and construction.").

- 13 -

Initially, I note that I in no way reject the long line of cases indicating that the subjective intent of one of the contracting parties is not ordinarily germane to plumbing the meaning of contractual language. See Koziol, 41 A.3d at 651. In this instance, however, we are faced with (in the Pinnacle policy) an imperfect execution of what the PSA clearly reflects should have been produced; rather than looking at the subjective intent of each party, in my view, the Court should consider extrinsic evidence in an effort to glean the mutual intent of the parties. See Lexington Insurance Co. v. General Accident Insurance Co. of America, 338 F.3d 42, 47 (1st Cir. 2003) ("If * * * a policy provision is ambiguous, the court may take extrinsic evidence as to intent * * * ."); Harrigan v. Mason & Winograd, Inc., 121 R.I. 209, 213, 397 A.2d 514, 516 (1979) ("[There is a] general rule which permits a court to consider extrinsic evidence where relevant to prove a meaning to which the language of the instrument is reasonably susceptible, whether or not it appears to the court to be plain and unambiguous on its face."); see also Steven W. Feldman & James A. DeLanis, 68 Tenn. L. Rev. at 73 ("When courts interpret contracts, their purpose is to effectuate the parties' mutual intent.").

When I refer to considering extrinsic evidence in this case, I specifically have in mind the PSA between Quest and Brown. Even though the Pinnacle policy does not explicitly reference the PSA, it does, in Endorsement 4, provide that a "[n]amed [i]nsured" would include any "corporation, company, organization, estate or other entity but only to the extent [Brown] has agreed to do so." See Haffenreffer v. Haffenreffer, 994 A.2d 1226, 1232 (R.I. 2010) (stating that "[o]ur case law is clear that instruments referred to in a written contract may be regarded as incorporated by reference and thus may be considered in the construction of the contract") (internal quotation marks omitted). When one lays the PSA beside the Pinnacle policy, it is clear that the PSA enlightens one as to how the Pinnacle policy should have been worded. A thorough

assessment of the PSA makes clear that, regardless of the ambiguous language in the Pinnacle policy, the mutual intent of Brown and Quest at the time they signed that PSA was for Brown to name Quest as an additional insured on its commercial general liability insurance policy, not its professional liability insurance policy. See Hill v. M. S. Alper & Son, Inc., 106 R.I. 38, 47, 256 A.2d 10, 15 (1969) ("[W]e will * * * consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretative process and to assist in determining its meaning."). Although the Pinnacle policy is ambiguous, the terms of the PSA indicate that the mutual intent of the parties was to exclude Quest from the insurance coverage provided in Endorsement 17. See Grun v. Pneumo Abex Corp., 163 F.3d 411, 420 (7th Cir. 1998) (stating that, even where contract language is ambiguous, the court will look beyond it "where literal application of a text would * * * thwart the obvious intentions of its drafters") (internal quotation marks omitted); White v. Roughton, 689 F.2d 118, 120 (7th Cir. 1982) ("[T]he overriding purpose in construing a contract is to give effect to the mutual intent of the parties at the time the contract was made; and while the language of the contract is normally the best evidence of that intent, a court can properly disregard even unambiguous language when it is convinced that the parties meant something different from what they said."). Therefore, in my judgment, Quest is not entitled to a defense and/or indemnification from Pinnacle (or Genesis). Accordingly, I concur with the majority's conclusion, but not the route that they follow to reach that conclusion.

- 15 -



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    Quest Diagnostics, LLC v. Pinnacle Consortium of Higher Education, a Vermont Reciprocal Risk Retention Group et al.

**CASE NO:**    No. 2013-108-Appeal.
(PC 11-6410)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  June 27, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Presiding Justice Alice B. Gibney

**ATTORNEYS ON APPEAL:**

    For Plaintiff:  Mark P. Dolan, Esq.

    For Defendants:  Todd D. White, Esq.
                      Lewiss K. Loss, Pro Hac Vice