**BLISS MINE ROAD CONDOMINIUM ASSOCIATION**

v.

**NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY.**

No. 2009–33–Appeal.

Supreme Court of Rhode Island.

Nov. 1, 2010.

David P. Whitman, Esq., Providence, for Plaintiff.

John M. Boland, Esquire, Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

On December 9, 2005, Mother Nature paid a visit to coastal Rhode Island, wreaking havoc with a storm that featured wind gusts of up to seventy-five miles per hour accompanied by copious amounts of rain, snow, and sleet. Among the many properties damaged by the storm was a condominium owned by Susan and Robert Phinney. That property was insured under an insurance policy issued to the plaintiff, Bliss Mine Road Condominium Association, by the defendant, Nationwide Property and Casualty Insurance Co. Although there was a protracted period of negotiations, the parties were unable to successfully settle the matter because Nationwide insisted that the policy's windstorm deductible was applicable and that the amount of the deductible exceeded the loss.

The plaintiff filed suit; in a multicount complaint it alleged that Nationwide had breached the insurance contract, had waived certain rights under the contract,

should be estopped from raising certain policy defenses, and was guilty of bad faith.[1]

The case proceeded to trial before a jury. At the conclusion of the evidence, and before the case was submitted to the jury, plaintiff moved for judgment as a matter of law under Rule 50 of the Superior Court Rules of Civil Procedure. The trial justice reserved ruling on the motion and submitted the case to the jury, which returned a verdict for plaintiff. After the verdict, the trial justice granted plaintiff's motion for judgment as a matter of law.

On appeal, defendant Nationwide argues: (1) that the Superior Court's grant of a judgment as a matter of law in favor of plaintiff was improper; (2) that the instruction to the jury of the definition of windstorm was error because the policy contemplated a windstorm accompanied by other weather events; (3) that the jury instruction was misleading to the resultant prejudice of Nationwide; and (4) that the denial of the motion for a new trial was in error.

We affirm the judgment of the Superior Court.

### Facts and Travel

This story actually began in October, 2005, when a rain storm caused significant roof damage to the Phinneys' condominium unit. In repairing the roof, the workers discovered the presence of asbestos, prolonging the completion of the job. When the December storm struck, the work remained unfinished and the roof of the Phinneys' unit was covered by a tarp, which was not strong enough to resist the effects of the severe weather.

The Phinneys went to their property on the morning of December 10 to determine whether it had incurred any damage. At trial, Susan Phinney described the first floor as "fine." However, she said that as she and her husband continued up the stairs, they noticed that the stairwell windows had water coming down the inside, that water was pooling on the windowsills, and that there was evidence of water coming down the walls. When they reached the second floor, they saw water on the walls and on the ceiling. Water also had pooled on the furniture and other horizontal surfaces. In the common-area hallway, the ceiling was damaged and water was running into the electrical box.

The Phinneys notified Nationwide, and on December 10 or 12, 2005, commercial claims associate Charles O'Neil received notice of the claim arising from the December 9 storm. Mr. O'Neil visited the property and spoke with property manager Donna Gaess about the storm and the damages resulting therefrom. Because the claim stemming from the damages to the Phinneys' unit as a result of the October storm had not yet been resolved, Mr. O'Neil amended the estimate from the October loss to reflect the damages from the December loss.

O'Neil reported that the company estimated that the Phinneys' unit had sustained damages in the amount of $16,691.59. Not satisfied with Nationwide's initial estimate, the Phinneys countered with two estimates of their own. Although they negotiated for a period, the parties were unable to agree upon a value for the loss and the cost of the necessary repairs. Mr. O'Neil prepared a second estimate that placed the assessment of the loss at $18,734.61. He applied a $2,000 deductible to that assessment, reflecting a $1,000 deductible for each of the storms

---

1. The bad-faith claim was severed prior to trial and is not at issue in this appeal.

causing damage (October and December).[2] Mr. O'Neil forwarded the revised estimate and a corresponding check to Ms. Gaess. The estimate and check were received by the Phinneys, who chose not to accept Nationwide's offer. They returned the check to Nationwide around March 22 or 23, 2006, and commenced an appraisal process that was set forth in the insurance contract.

As the result of the appraisal process, a determination of award was made in June 2006 that placed the value of the loss at $26,977.77. However, on June 29, Mr. O'Neil notified plaintiff Condominium Association that the amount of the award was less than the windstorm deductible set forth in the policy; and, therefore, Nationwide would not provide compensation.[3]

### The Windstorm Deductible

The declarations page of the Nationwide insurance policy covering the Phinneys' property specifies that there is a $1,000 deductible for claims. However, contained within the policy language is a different deductible if damages are caused by "windstorm." That language is as follows:

"The Windstorm or Hail Deductible, as shown in the Schedule, applies to loss or damage to Covered Property caused directly or indirectly by Windstorm or Hail, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage. If loss or damage from a covered weather condition other than Windstorm or Hail occurs, and that loss or damage would not have occurred but for the Windstorm or Hail, such loss or damage shall be considered to be caused by Wind-

storm or Hail and therefore part of the Windstorm or Hail occurrence.

"With respect to Covered Property at a location identified in the Schedule, no other deductible applies to Windstorm or Hail.

"The Windstorm or Hail Deductible applies whenever there is an occurrence of Windstorm or Hail.

### "WINDSTORM OR HAIL DEDUCTIBLE CLAUSE

#### A. ALL POLICIES

"In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to 1%, 2% or 5% (as show in the Schedule) of the Limit(s) of Insurance applicable to the property that has sustained loss or damage."

The schedule accompanying the windstorm deductible shows a deductible percentage of 1 percent. The parties agree that 1 percent of the amount of coverage on the building at Bliss Mine Road ($3,240,000) is approximately $32,400. Because that figure exceeds the $26,977.77 appraisal for the damage resulting from the December storm, Nationwide was unwilling to make further payment on the claim.

At trial, Susan Phinney and property manager Donna Gaess testified for plaintiff; claims representative Charles O'Neil and meteorologist Steven Cascione testified for the defense.

Mr. O'Neil testified that Ms. Gaess informed him of the "significant storm * * * which resulted in the tearing up of the work that was going on on the roof and resulted in interior water damage." Mr. O'Neil testified that it was his agreement with property manager Donna Gaess that

---

**2.** Less the two $1,000 deductibles, this resulted in a net claim of $16,734.61.

**3.** In a letter dated April 12, 2006, Nationwide's attorney informed the Phinneys that the company would apply the windstorm de-

ductible to the loss. Ms. Phinney notified the Condominium Association's board, but maintained in her testimony that she thought the deductible did not apply to the claim.

the loss was attributed to a windstorm. He conceded, however, that the parties did not discuss this term in the context of the specific policy language.

Meteorologist Steven Cascione testified for Nationwide that a storm developed as snow between 4 and 5 a.m. on December 9. That snow changed to sleet and freezing rain; and around 11 a.m., a heavy band of rain moved in from Connecticut with an arctic front and an area of low pressure developing off the New Jersey coast. The storm later began to produce very heavy snow and sleet as it continued to travel northward into Rhode Island. Heavy snow gradually moved into Narragansett Bay later in the afternoon. At 1:15 p.m., the storm system intensified and heavy rain changed to heavy snow, accumulating at a rate of two to three inches per hour. The witness testified that blizzard conditions developed across the state. At the time the storm intensified, the winds increased from twenty miles per hour to between thirty-five and forty-three miles per hour. The National Weather Service registered winds as high as forty-seven miles per hour between noon and 5 p.m. Mr. Cascione further testified that the winds reached the coast with gusts between seventy and seventy-five miles per hour, and as high as one hundred miles per hour from Cape Cod to Block Island.

At the close of the evidence, plaintiff moved for judgment as a matter of law as to count 1 of the complaint, breach of contract, based upon Rule 50 of the Superior Court Rules of Civil Procedure.[4] Rule 50 provides in pertinent part:

"(a) * * *

"(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

" * * *

"(b) * * * Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. * * * If a verdict was returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law."

After hearing argument from both parties, the trial justice reserved judgment on plaintiff's motion. The trial justice issued instructions to the jury on the three counts of the complaint and submitted the case for its consideration. The jury returned a verdict in favor of plaintiff on count 1 of the complaint; but after reconsidering the motion for judgment as a matter of law, the trial justice entered judgment for plaintiff based on Rule 50.[5] On appeal,

4. The defendant made similar motions on counts 2 and 3, waiver and collateral estoppel. Those motions were denied and those rulings are not before us.

5. We observe that, when he entered judgment on the Rule 50 motion, the trial justice provided no analysis for doing so. Even though, given our standard of review, this does not have an impact on our analysis, we nonetheless believe that litigants are entitled to be informed of the trial justice's reasoning.

Nationwide argues (1) that the Superior Court's grant of a judgment as a matter of law in favor of plaintiff was improper; (2) that the instruction to the jury of the definition of windstorm was error because the policy language contemplates a windstorm accompanied by other weather events; (3) that the jury instruction was misleading, resulting in prejudice to Nationwide; and (4) that the denial of the motion for a new trial was error. Because we affirm the court's judgment under Rule 50, we need not consider the propriety of the jury instructions or the validity of the jury's verdict.

### Standard of Review

"When this Court reviews the entry of judgment as a matter of law based on Rule 50(a)(1), it applies the same standard as did the trial justice." *Black v. Vaiciulis*, 934 A.2d 216, 219 (R.I.2007); *Mills v. State Sales, Inc.*, 824 A.2d 461, 472 (R.I.2003); *see also Tedesco v. Connors*, 871 A.2d 920, 927 (R.I.2005). "The trial justice, and consequently this Court, 'considers the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party.'" *Black*, 934 A.2d at 219 (quoting *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996)); *see also Tedesco*, 871 A.2d at 927; *Mills*, 824 A.2d at 472. Thus, this Court considers if " 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue * * *.'" *Black*, 934 A.2d at 219. The motion must be denied, however, if there are "factual issues on which reasonable people may draw different conclusions." *Id.; see also Tedesco*, 871 A.2d at 927; *Mills*, 824 A.2d at 472.

The defendant timely appealed. On appeal, defendant argues that the windstorm deductible applies because the term windstorm is not ambiguous when the insurance agreement is viewed in its entirety and its terms are given their ordinary meaning; and further, that a windstorm is any storm with high levels of wind, irrespective of any precipitation.

### Analysis

#### I

#### What is a Windstorm? Is the Contract Ambiguous?

Whether a contract is ambiguous is a question of law. *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 558 (R.I.2009); *see also Gorman v. Gorman*, 883 A.2d 732, 738 n. 8 (R.I. 2005). A trial court's ruling concerning ambiguity is reviewed by this Court on a *de novo* basis. *Young*, 973 A.2d at 558 (citing *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1259 (R.I. 2003)). This Court applies the rules for construction of contracts when interpreting an insurance policy and will depart from the literal language of the policy only if the policy is ambiguous. *Mallane v. Holyoke Mutual Insurance Co.*, 658 A.2d 18, 20 (R.I.1995) (citing *Aetna Casualty & Surety Co. v. Sullivan*, 633 A.2d 684, 686 (R.I.1993)). To determine whether the policy is ambiguous, we give words their plain, ordinary, and usual meaning. *Id.* The Court considers the policy in its entirety and does not "establish ambiguity by viewing a word in isolation or by taking a phrase out of context." *Amica Mutual Insurance Co. v. Streicker*, 583 A.2d 550, 552 (R.I.1990). The Court will "refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present." *Mallane*, 658 A.2d at 20. In determining whether the contract has an ambiguous meaning, this Court cannot consider the subjective intent of the parties; but rather must consider the intent expressed

by the language of the contract. *Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 581 n. 10, 410 A.2d 986, 991 n. 10 (1980). A contract, however, is ambiguous when it is "reasonably susceptible of different constructions." *Id.* at 579, 410 A.2d at 991.

The term "windstorm" is not defined in the Condominium Association's insurance policy. We consider the meaning of the word in the context of the contract by looking at the entire policy and giving its terms their plain, ordinary, and usual meaning. We often have looked to dictionary definitions when determining a word's ordinary meaning. *Chambers v. Ormiston*, 935 A.2d 956, 962 (R.I.2007); *Westinghouse Broadcasting Co.*, 122 R.I. at 581 n. 11, 410 A.2d at 992 n. 11. Random House Dictionary defines a windstorm as "a storm with heavy wind but little or no precipitation." Random House Unabridged Dictionary 2178 (2d ed.1993).

The plaintiff asserts that term is ambiguous and, as such, should be construed in favor of the insured. At trial, plaintiff offered several examples of the definition of a windstorm. The American Heritage Dictionary 1384 (2d college ed.1985) defines the term windstorm as "[a] storm with high wind or violent gusts but little or no rain." Random House College Dictionary 1509 (rev. ed.1975) defines the term windstorm as "a storm with heavy wind but little or no precipitation." Webster's Seventh New Collegiate Dictionary 1023 (1971) defines windstorm as "a storm marked by high winds with little or no precipitation."

On the other hand, Nationwide contends that the term windstorm is not ambiguous when considered in the context of the policy, and it offers an altogether different definition of the term. The defense maintains that a windstorm is a storm with high levels of wind, irrespective of precipitation. To support this contention, defendant cites cases in which the court rejected the argument that a windstorm could not be accompanied by precipitation.[6] The defendant argued that in *Pierce v. Allstate Insurance Co., SJD–CC v. Marsh, U.S.A., Inc.*, and *Cindass v. Allstate Insurance Co.*, the U.S. District Court for the Eastern District of Louisiana granted the defendant insurers' motions for summary judgment because the windstorm deductibles of the plaintiffs' insurance policies precluded recovery.[7] *Pierce v. Allstate Insurance Co.*, 542 F.Supp.2d 495 (E.D.La.2008); *SJD–CC v. Marsh, U.S.A., Inc.*, 2008 WL 2520445 (E.D.La.); *Cindass v. Allstate Insurance Co.*, 2007 WL 3172111 (E.D.La.).

6. The defendant also relies on a Rhode Island case, *Napoletano v. Standard Fire Insurance Co.*, 102 R.I. 604, 232 A.2d 378 (1967). However, the central issue in that appeal was whether damage was caused by the wind of Hurricane Carol or the "ocean on its rampage." *Id.* at 608, 232 A.2d at 381. This Court ruled that summary judgment was improper because determining the event that caused the damage was a question of fact for the jury. *Id.* In *Napoletano*, the plaintiff would have recovered under his policy if the hurricane caused the damage, but would not if the loss was caused by water damage "unless the building covered * * * first sustain[ed] an actual damage to roof or walls by the direct force of wind or hail * * *." *Id.* at 605 n. 3, 232 A.2d at 380 n. 3. In contrast, the parties here do not dispute the nature of the weather event that precipitated the claim, but only whether the windstorm deductible was triggered.

7. In all of those cases, the storm in question was Hurricane Katrina, a catastrophic storm that ravaged the Gulf Coast of the United States in August 2005. After making landfall, it featured winds of 125 miles per hour and ten to fourteen inches of rain. The storm took more than 1800 lives and is estimated to have caused $125 billion in damages. Richard D. Knabb et al., Tropical Cyclone Report Hurricane Katrina (updated Aug. 10, 2006) (available at http://www.nhc.noaa.gov/pdf/TCR–AL122005_Katrina.pdf).

After reviewing the insurance contract language in its entirety and after applying our well-developed rules of construction, it is our opinion that the term "windstorm," as used in the policy, is reasonably susceptible to more than one meaning, and that it therefore is ambiguous.

When an ambiguity such as the one at issue here arises in an insurance contract, we construe the ambiguity strictly in favor of the insured. *Sullivan*, 633 A.2d at 686; *Bartlett v. Amica Mutual Insurance Co.*, 593 A.2d 45, 47 (R.I.1991). We therefore construe the term windstorm to mean a storm with high winds or gusts, but little to no precipitation. In view of this construction, the only remaining issue is whether a reasonable jury could conclude, considering all the evidence in the light most favorable to defendant, that the storm of December 9, 2005 was a storm with high winds or gusts, but little to no precipitation.

## II

### The Storm of December 9, 2005

The defendant contends that whether the storm of December 9, 2005 was a windstorm was a question for the jury. The storm was, without question, a turbulent weather event that featured intense winds. However, the testimony of the defense's witness, meteorologist Steven Cascione, precludes any conclusion that the storm of December 9, 2005 was a storm of high wind with little or no precipitation. This is so because Mr. Cascione, who offered unrebutted expert testimony, testified that the storm included a variety of precipitation including sleet, freezing rain, and heavy snow. He noted:

"[A] storm developed as snow in Rhode Island between [4] and 5 a.m. on December 9th, snow changed to sleet and freezing rain late morning, and then around 11:00, we used radar that

showed a very heavy area of rain moving from Connecticut * * *. * * * What happened was, 1:15 in the afternoon, the storm system began to intensify and heavy rain went over to a rapidly changing heavy snow with winds increasing from 20 miles an hour to between 35 and 43 miles an hour with 47 mile an hour winds registered by the National Weather Service in that noon to 5 p.m. timeframe."

He went on to describe the "blizzard conditions" that developed, characterized by extremely high winds and snow. The witness testified that the total snow accumulation was between six and ten inches, an amount of precipitation equaling approximately 0.69 inches of rain. Because the storm, as described by Mr. Cascione, included a considerable amount of precipitation in a variety of forms, it cannot be described as a windstorm under the Bliss Mine Road Condominium Association insurance policy. We therefore hold that a reasonable jury could not draw any conclusion other than that the damage was caused by the snowstorm, albeit a snowstorm that included very strong winds and, therefore, that the windstorm deductible does not apply. *See Black*, 934 A.2d at 219 (A motion for judgment as a matter of law must be denied when there are "factual issues on which reasonable people may draw different conclusions."); *see also Tedesco*, 871 A.2d at 927; *Mills*, 824 A.2d at 472. For that reason, we conclude that the trial justice properly granted the plaintiff's motion for judgment as a matter of law.

### Conclusion

The judgment of the Superior Court is affirmed. The record in this case shall be returned to that tribunal.