**Supreme Court**

| | | |
|---|---|---|
| Peerless Insurance Company | : | |
| v. | : | No. 2014-99-Appeal. |
| | | (WC 12-17) |
| Denise Luppe. | : | |

| | | |
|---|---|---|
| Peerless Insurance Company | : | |
| v. | : | No. 2014-100-Appeal. |
| | | (WC 12-17) |
| Christopher Henderson. | : | |

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Peerless Insurance Company       :

         v.             :         No. 2014-99-Appeal.

                                                (WC 12-17)

Denise Luppe.                :


Peerless Insurance Company       :

         v.             :         No. 2014-100-Appeal.

                                                (WC 12-17)

Christopher Henderson.       :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  Is the minor daughter of divorced parents, who lives with her mother but regularly stays at her father's home for overnight visits twice per week, a resident of the father's home for the purpose of determining coverage under the provisions of a homeowner's insurance policy?  Under the undisputed facts present in this case, we hold that the child does reside at her father's home and we therefore affirm the judgment of the Superior Court.  The defendants, Christopher Henderson and Denise Luppe, each appeal from a final judgment entered in Washington County Superior Court granting summary judgment in favor of the plaintiff, Peerless Insurance Company (Peerless), and denying Ms. Luppe's cross-motion for

summary judgment.[1]  The defendants are the divorced parents of a minor child, Maya Henderson.  On August 23, 2010, while Maya was enjoying overnight visitation with her father, she was bitten by her father's dog and suffered serious injuries.  Ms. Luppe soon brought a personal injury suit on Maya's behalf against Mr. Henderson, who sought a defense under the terms of his homeowner's insurance policy with Peerless.  Peerless responded by filing a declaratory judgment action, pursuant to G.L. 1956 § 9-30-1.  In this action, Peerless sought a declaration that Maya was a resident of her father's household and, therefore, was excluded from coverage for injuries that she sustained when she was bitten by the dog.

## I

## Facts and Travel

Maya's parents separated in January 2009, completed a property settlement agreement in September 2009, and terminated their marriage pursuant to a judgment of absolute divorce entered in the Family Court in May 2010.  The judgment of divorce awarded joint legal custody of Maya to her parents, with "physical placement to be with [Ms. Luppe] and [Mr. Henderson] to have all reasonable rights of visitation."  This was consistent with the couple's property settlement agreement, which was incorporated by reference in the judgment, and which defined joint custody as "shared responsibility for all major decisions concerning the upbringing, education, medical care, dental care, spiritual care, and all matters concerning the general welfare of the child."  Following the couple's separation, Mr. Henderson lived nearby in a small studio apartment, and Ms. Luppe remained in the former marital domicile.  As a result of the small size of Mr. Henderson's apartment, Maya's visits with her father between January 2009

---

[1]  Prior to oral argument, the parties stipulated to a motion to consolidate these two matters, No. 2014-99-A. and No. 2014-100-A.  The Court granted the motion and will issue this single opinion.

and June 2010 mostly took place at her mother's home, which Mr. Henderson visited after work on a near daily basis for a few hours each day. In fact, Mr. Henderson testified by deposition that Maya had no more than a couple of overnight visits to his studio apartment.

However, Mr. Henderson soon purchased a home that had sufficient space to allow a regular schedule of overnight visitation with his daughter.[2] That visitation schedule, agreed to amicably by both parents, was "pretty rigid," in the words of Mr. Henderson. Accordingly, Maya would stay at her father's house two days each week, overnight, on Wednesdays and Sundays. After exercising overnight visitation, Mr. Henderson would bring Maya to school, and Ms. Luppe or Maya's grandmother would pick her up at the end of the school day. When Maya stayed at her father's house, she would sleep in her father's bedroom, despite the presence of a "spare guest room" in the house. However, Maya would sleep in that room when her cousins would occasionally visit her at her father's home. Maya's paternal grandparents also regularly visited, and, when they did, they would stay in that bedroom as well. The bedroom did contain some of Maya's toys and clothing, including "essentials" and various other "backup items," such as a "[s]weatshirt, * * * shorts, a pair of jeans, sandals, [and] sneakers." Generally, what Maya would wear during visitation depended on how she was attired when she arrived at her father's home. On occasion, Maya would bring a bag she used to transfer her belongings between her mother's and father's houses. Mr. Henderson's house also contained various toiletries belonging to Maya, including a toothbrush, hairbrush, and hair dryer. Mr. Henderson gave deposition testimony that he did not consider his house to be Maya's home, and neither did she: "[Maya]

---

[2] All three properties are in the town of Westerly. To avoid confusion, the home that defendants shared while married will be referred to as the mother's house. The home where the injuries occurred, where the father lived after his studio apartment, will be referred to as the father's house.

knows it as daddy's house. You know, she knows [her mother's] home as, let's say, home, and she knows my home as daddy's house."

On Sunday, August 22, 2010, Maya was at her father's house, in keeping with the normal visitation schedule. While Mr. Henderson was in the kitchen, Maya was attacked by the father's dog. Maya required significant medical attention as a result of the dog bite.[3]

In 2011, Ms. Luppe filed the underlying personal injury lawsuit, both on behalf of her daughter and asserting injuries of her own against Mr. Henderson.[4] The complaint alleged that Maya was viciously attacked and "was disfigured, suffered personal injuries, * * * may continue to suffer great pain of mind and body, and incurred medical expenses in connection" with the attack. At the time of the injuries to Maya, Mr. Henderson was insured under a homeowner's liability policy issued by Peerless. When he was served with the lawsuit brought on Maya's behalf, Mr. Henderson sought a defense from Peerless under the terms of the policy. However, Peerless pointed to an exclusion in the homeowner's policy, specifically Section II – Exclusions, 2(f), which says that personal liability coverage does not extend to cover liability for "'[b]odily injury' to you or an 'insured' within the meaning [of this policy]." Further, the policy defines an "insured" as "you and residents of your household who are: a. [y]our relatives; or b. [o]ther persons under the age of [twenty-one] and in the care or any person named above." Peerless contends that, at the time of her injury, Maya was a resident of her father's home and, therefore, there was no coverage for her injury because Maya was considered an insured under the policy.

---

[3] After the incident, Mr. Henderson returned the dog to the home from which he had adopted him, but defendants did not modify their custody arrangement with Maya. As Mr. Henderson testified, "even though it was a bad incident, we wanted to keep [our visitation schedule] normal."

[4] Ms. Luppe individually alleged that she suffered a loss of consortium with her daughter because of Maya's injuries. That claim is not addressed by this opinion.

On January 10, 2012, Peerless filed a complaint for declaratory judgment, asking the Superior Court to determine if Maya was a resident of her father's house.[5] Mr. Henderson filed a counterclaim to Peerless's complaint, alleging that Peerless had breached its contract of insurance, had acted in bad faith, and had breached its fiduciary duty to Mr. Henderson by taking a position that was adverse to his best interests.[6]

During the course of discovery, Ms. Luppe gave deposition testimony, in which she generally agreed with Mr. Henderson's characterization of Maya's visitation arrangements as regular, and, barring occasional minor changes due to scheduling, consisted of two overnight stays per week. Ms. Luppe also agreed that Maya kept some of her clothing and some of her toys at her father's house. However, Ms. Luppe testified that Maya was listed as a resident of her home on a variety of school forms, that any mail Maya would receive would be directed to her home, and that Maya was claimed as an exemption on the tax returns that she filed with her husband.

On August 16, 2013, Peerless filed a motion for summary judgment, claiming that there were no issues of fact in dispute and arguing that the undisputed facts supported a finding that Maya was a resident of her father's household when she was injured. Both defendants objected to the motion. In addition, Ms. Luppe filed a cross-motion for summary judgment.

On November 18, 2013, the motions were heard by a justice of the Superior Court.[7] At the hearing, the parties agreed that there were no genuine issues of material fact. The parties also

_____

[5] Additionally, Peerless asked the Superior Court for a declaratory judgment that Ms. Luppe did not suffer bodily harm, which would resolve the claims in the underlying personal injury suit in which Ms. Luppe was an individual plaintiff. The parties stipulated to declaratory judgment in favor of Peerless on this count.

[6] The counterclaim has been stayed by agreement, pending the outcome of this action.

[7] Before the motions were heard, the parties agreed on a high-low binding settlement in the underlying personal injury action. This agreement provided that, if Peerless were to prevail in its

agreed that the test to be applied to determine residency for insurance purposes was contained in prior decisions of this Court: Aetna Life and Casualty Co. v. Carrera, 577 A.2d 980, 985 (R.I. 1990), and a subsequent opinion, Barricelli v. American Universal Insurance Co., 583 A.2d 1270, 1271 (R.I. 1990). Counsel for Ms. Luppe then asked the hearing justice to consider an affidavit from an experienced family law attorney that she had submitted with her motions. Counsel for Peerless objected, arguing, "[i]f it's [Ms. Luppe's] position that there's no issue of fact here, then I don't understand the purpose of the * * * affidavit. If it's not being offered to establish an issue of fact, my position is it shouldn't be considered." After argument, the hearing justice issued a bench decision and granted summary judgment for Peerless, observing that she had not been persuaded by the affidavit and that, because the parties agreed on the facts, the issue before her was a question of law. The hearing justice held that Maya was a resident of Mr. Henderson's home and therefore concluded that there was no coverage for her injuries under the Peerless policy. Each defendant filed a timely notice of appeal.

## II

### Standard of Review

We review a hearing justice's grant of summary judgment de novo. Miller v. Metropolitan Property and Casualty Insurance, Co., 111 A.3d 332, 339 (R.I. 2015) (citing Emond Plumbing & Heating, Inc. v. BankNewport, 105 A.3d 85, 89 (R.I. 2014)). In our review of the record, we employ the same standard as the hearing justice: "[i]f we conclude, after viewing the evidence in the light most favorable to the nonmoving party, that there is no genuine issue of material fact to be decided and that the moving party is entitled to judgment as a matter

---

declaratory judgment action, the parties would settle in the amount of $50,000 to be paid by Peerless to Ms. Luppe and her daughter in satisfaction of all claims. However, if Peerless were to be unsuccessful, it would in that event pay $225,000 to satisfy all claims.

of law, we will affirm the grant of summary judgment." Leone v. Mortgage Electronic Registration Systems, Inc., 101 A.3d 869, 872 (R.I. 2014) (quoting Pereira v. Fitzgerald, 21 A.3d 369, 372 (R.I. 2011)). "Summary judgment is appropriate when the hearing justice, after considering the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' finds 'no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law.'" Miller, 111 A.3d at 339 (quoting Emond, 105 A.3d at 89).

## III

## Discussion

In their consolidated appeals, defendants advance several arguments as to why summary judgment was wrongly granted in favor of Peerless. Both defendants argue that the test for residency, when properly applied, should have resulted in a finding that Maya was not a resident of her father's household. Ms. Luppe argues that the hearing justice did not properly consider the affidavit she submitted from a family law attorney, and that the term "resident" should have been construed narrowly in this case in order to serve the greater policy of expanding insurance coverage. Lastly, Mr. Henderson argues that the term "resident" in his Peerless insurance policy is ambiguous and consequently should be construed against the insurer, the drafter of the document. We shall address these arguments below.

### A. The Affidavit

Before the hearing justice, Ms. Luppe argued that the affidavit that she submitted from an experienced family law attorney should be conclusive on the question of Maya's residency. The affidavit stated that, because during their divorce proceedings the parties had agreed that Maya's physical placement would be with her mother, the young girl's residence was with her mother

only.[8]  At the hearing, Peerless contested the relevance of the affidavit because "possession and custody for purposes of divorce are not the same as residence for purposes of insurance."  In her bench decision, the hearing justice stated that she was "not persuaded that custody could have been crafted differently as discussed in [the submitted] affidavit."

In the affidavit at issue, the affiant averred that he had reviewed the documents from defendants' Family Court divorce and that in his "expert opinion," Maya should be considered to be a resident of Ms. Luppe's household only.  In our opinion, however, such a statement is merely the affiant's legal conclusion, based on the circumstances of defendants' divorce, and it raises no material issue of fact.  Indeed, it is well settled that such an opinion is permissible only "when the subject matter is wholly scientific or so far removed from the usual and ordinary experience of the average lay person * * * ."  Vallinoto v. DiSandro, 688 A.2d 830, 851 (R.I. 1997) (citing Marshall v. Tomaselli, 118 R.I. 190, 196-98, 372 A.2d 1280, 1284-85 (1977)).  An expert is one who "through education or experience, has developed skill or knowledge in a particular subject, so that he or she may form an opinion that will assist the fact-finder."  Black's Law Dictionary 699 (10th ed. 2014).  Here, with the facts largely undisputed, it was a legal conclusion that was required and the parties agreed that the test for residency was controlled by our prior holdings in Carrera, 577 A.2d at 985, and Barricelli, 583 A.2d at 1271.  Both cases set forth, in plain language, who is considered to be a resident of a household for the purposes of an

---

[8]  The affidavit states in relevant part:

> "2. I have been retained by the Defendant Denise Luppe, through her counsel, to offer an expert opinion as to whether, pursuant to the terms of the final judgment of divorce and property settlement agreement, Maya Henderson would be considered a resident of Christopher Henderson's household.
> "3. To a reasonable degree of certainty, I can state that pursuant to the terms of the Final Decree and Property Settlement Agreement Court [sic], Maya would be considered a resident of Denise Luppe's household only."

insurance policy. Although the test is layered with multiple factors and considerations of the totality of the circumstances, it does not contemplate matters that are outside the usual and ordinary experience of a layperson. See Vallinoto, 688 A.2d at 851 (citing Marshall, 118 R.I. at 196-98, 372 A.2d at 1284-85). The affidavit offered an expert opinion that became unnecessary by the parties' agreement that there were no facts in dispute. We believe the hearing justice could have been clearer in the way that she addressed the affidavit, but we are not swayed by defendants' allegations of legal error.

### B. The Term Resident is Not Ambiguous

Mr. Henderson argues that the term "resident" in his Peerless insurance policy is ambiguous. There is no doubt that "[a]n ambiguity in an insurance policy is strictly construed against the insurer." Koziol v. Peerless Insurance Co., 41 A.3d 647, 651 (R.I. 2012) (citing Bliss Mine Road Condominium Association v. Nationwide Property and Casualty Insurance Co., 11 A.3d 1078, 1085 (R.I. 2010)). However, this Court determines whether a contract is ambiguous as a question of law, employing de novo review. Id. at 649 (citing Bliss Mine Road Condominium Association, 11 A.3d at 1083). In doing so, we read the policy in its entirety, giving words their plain meaning; importantly, we refrain from "engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present." Mallane v. Holyoke Mutual Insurance Co. in Salem, 658 A.2d 18, 20 (R.I. 1995) (citing Aetna Casualty & Surety Co. v. Sullivan, 633 A.2d 684, 686 (R.I. 1993)).

It is our opinion the term "residents of your household," as set forth in Peerless's policy, is not ambiguous, especially when read in context with the words of the next part of the definition, "who are * * * your relatives." The defendants do not articulate how they believe this definition is ambiguous, arguing simply that "the meaning of the resident exclusion contained in

the policy is ambiguous as it relates to the facts of the case at bar." We believe, as other courts have succinctly said, "a contract is not rendered ambiguous merely because the parties disagree over its proper interpretation." Greaves v. State Farm Insurance Co., 984 F. Supp. 12, 15 (D.D.C. 1997) (quoting Gryce v. Lavine, 675 A.2d 67, 69 (D.C. 1996)).

Indeed, this Court has already defined the term "resident" in the context of insurance policies and has noted the common existence of multiple residences.[9] See Barricelli, 583 A.2d at 1271 (agreeing with the contention that it is consistent with Carrera, "for [the child] to be a 'resident' of both [of her parents'] households at the time of the accident," citing Carrera, 577 A.2d at 983-84). Being a resident implies more than being a mere transient guest, because a resident is "[s]omeone who has a home in a particular place"; that place is often where he or she lives, sleeps, and carries on life with regularity. Black's Law Dictionary 1502 (10th ed. 2014). Shared-custody arrangements are increasingly frequent in our society,[10] and we recognize that a child may call multiple dwellings his or her home. We perceive no ambiguity in the term, particularly when we gather its meaning, as we always have: "derived in part from the context in which it is used." Carrera, 577 A.2d at 983 (citing Flather v. Norberg, 119 R.I. 276, 281, 377 A.2d 225, 228 (1977)); see also 9A Steven Plitt et al., Couch on Insurance 3d § 128:6 at 128-15 (2005) ("[A] determination of whether a person is a resident of a particular household is an elastic concept entirely dependent upon the context in which the question arises."). We now shall address the application of the law to this case's uncontested facts.

---

[9] This is not to be confused with legal domicile, "for a person may have two places of residence, as in the city and country, but only one domicile." Aetna Life and Casualty Co. v. Carrera, 577 A.2d 980, 983 (R.I. 1990) (quoting Black's Law Dictionary 1176 (5th ed. 1979)).

[10] Mr. Henderson included in the appellate record a fact sheet from the U.S. Department of Health and Human Services, which says that "approximately 40 percent of U.S. children have divorced parents."

## C. Application of the <u>Carrera</u> Test

Although defendants disagree with the hearing justice's finding, Peerless argues that there was no error in the hearing justice's grant of summary judgment, because the definition of resident is constant across all types of insurance and not dependent on the type of policy considered. Determining residency in the specific context of a homeowner's policy is, to some extent, a matter of first impression for this Court, because our prior cases involved uninsured/underinsured-motorist automobile insurance only. In our opinion, the term resident should not have vastly different meanings across multiple types of insurance contracts. This Court has set out our test for residency in the insurance context, and we perceive no error in the hearing justice's application of that test to these facts.

The purpose of a homeowner's insurance policy is to defend and indemnify the insureds against liability claims filed by others who may have been injured in the insureds' home or on their property. 9A <u>Couch on Insurance</u> 3d § 128:2 at 128-7 (such policies insure "against the risk of liability for injuries suffered by others, not injuries suffered by the insured"). Homeowner's policies commonly and expressly exclude coverage for injuries sustained by an insured, and they define an insured as a resident of the household. <u>Id.</u> at 128-7, 128-8. In view of the fact that the term resident is found in contracts across the entire insurance spectrum, "[n]ot surprisingly, a great deal of litigation has ensued," and indeed, this Court has already considered the question of what defines a resident for the purposes of construing an insurance contract. <u>Id.</u> at 128-8; <u>see</u> <u>Carrera</u>, 577 A.2d at 984-85.

In <u>Carrera</u>, 577 A.2d at 981, the insured was the defendant in a declaratory-judgment action brought by her insurance company. The insured's adult son had died in a Florida automobile accident involving an uninsured vehicle. <u>Id.</u> In the defendant's capacity as the

administrator of her son's estate, she made a demand on her own automobile insurance company, claiming that her son was a resident of her household at the time of his death and that, therefore, he was covered under the provisions of her policy's uninsured-motorist benefits. Id. This Court adopted the reasoning of Flather, which addressed the definition of resident for the purposes of state income tax, and specifically embraced four factors that are significant in determining residency: "(1) the amount of time [one] spends in the locality (2) the nature of [one's] place of abode (3) [one's] activities in the locality and (4) [one's] intentions with regard to the length and nature of [one's] stay." Carrera, 577 A.2d at 984 (quoting Flather, 119 R.I. at 283, 377 A.2d at 229). In Carrera, we focused on the fourth factor, intent, and determined that it was fatal to the defendant's contention that her son resided in her home. Id. at 984-85. This was so because her son was, in fact, a fugitive from the state of Rhode Island, making it likely that at the time of the accident, "he had no intention of returning to his mother's household or to this jurisdiction." Id. at 985. Specifically, we said:

> "In order to determine if a person is a resident of a particular household, the court must consider whether in the totality of the circumstances that person maintains a physical presence in the household with intent to remain for more than a mere transitory period, or that person has a reasonably recent history of physical presence together with circumstances that manifest an intent to return to the residence within a reasonably foreseeable period." Id.

Put simply, one who maintains a personal presence in a home with the intent to continue that presence for more than a temporary period is considered a resident of that home under our law. Id. In Carrera, because of the defendant's son's lack of intent to return to his mother's home, we affirmed the judgment that he was not a resident of her home at the time of his fatal accident. Id.

at 985-86. As a result, his estate was unable to maintain a claim for insurance benefits under his mother's policy. Id.

Shortly after the pronouncement of this definition, this Court again addressed the question of residency, this time in the context of a child of divorce. Barricelli, 583 A.2d 1270-71. In Barricelli, a case that is more factually similar to the situation here than is Carrera, the plaintiffs were divorced parents and co-administrators of the estate of their deceased daughter, Gina. Id. at 1270. The plaintiffs sought a declaration that the estate's losses, stemming from Gina's death, which occurred while she was a passenger in a single-car accident, were covered by her mother's uninsured/underinsured-motorist insurance. Id. The defendant carrier filed a motion for summary judgment, asserting that Gina was not a resident of her mother's household at the time of her death, a requisite for coverage. Id. The defendant's motion was granted and, occasioned by the parents' appeal, this Court was asked to review the determination of Gina's residency. Id. In our decision, we observed that the parents were divorced pursuant to a decree of the Family Court that had awarded custody of Gina to her mother, that Gina lived with her mother for several years following the divorce, and that ultimately she had moved in with her father some three years before the fatal accident. Id. at 1271. After that move, Gina's contacts with her mother's household were "structured, albeit intermittent." Id. Those contacts included weekly visits to her mother's home and overnight visits on alternate weekends, during which Gina would sleep on a pullout sofa. Id. Although Gina did keep one or two changes of clothing and some personal belongings at her mother's house, for the overnight visits she packed a suitcase. Id. We recognized that "not all types of contact with an insured's household make a person a 'resident,'" and we held that because Gina's contacts with her mother's home were infrequent, that she lacked a regular bed to sleep in, and that she needed to pack a suitcase to

- 13 -

visit for weekends, it could not be said that her presence in her mother's house was more than for "a mere transitory period." Id. at 1271, 1272. Accordingly, we concluded that Gina was not a resident of her mother's home for purposes of her mother's insurance policy. Id. at 1272.

Here, in our de novo review, we find ourselves convinced by an analysis of the agreed facts that Maya was a resident of Mr. Henderson's household. There was no dispute that Maya regularly was present in her father's home subject to an amicable custody agreement and judgment of divorce. Various items of Maya's clothing and personal belongings could be found throughout the house and in the home's second bedroom, to the extent that she needed little more than an occasional bag on her twice-weekly visits. Maya's visitation arrangement was regular, the parties had every intention of continuing the custody agreement on the date of the incident, and, in fact, it did continue on the same schedule even after Maya's injuries. Further, Maya's grandparents and cousins would often visit her at her father's home. The nature of this type of presence in her father's home establishes that Maya was there for more than "a mere transitory period"; indeed, when Maya was at Mr. Henderson's house, it was functionally her home. Barricelli, 583 A.2d at 1272. We acknowledge, as defendants argue, that Maya was listed as residing in her mother's home for purposes of school enrollment, that what little mail she received was delivered to her mother's home, and that Maya's mother claimed her daughter on her tax returns. However, while these factors may certainly support an argument that Maya was a resident of her mother's home, they do nothing to disprove that she also resided with her father. We acknowledged in Carrera, 577 A.2d at 984, "the general rule that one may have more than one residence." In our opinion, we should not concentrate on whether Ms. Luppe's home qualified as Maya's residence, but should focus instead on Maya's contacts with her father's house and whether those circumstances satisfied the criteria that were first set forth in Carrera

and were restated in <u>Barricelli</u>.  In the context of the totality of the circumstances, we conclude that Maya was a resident of Mr. Henderson's home on the day she was injured because it was a place at which she had a "recent history of physical presence together with circumstances that manifest an intent to return to the residence within a reasonably foreseeable period."  <u>Carrera</u>, 577 A.2d at 985.

### D. Policy Concerns

We do not believe that our conclusion as to Maya's residency with her father is an anomaly; indeed, we point to several other jurisdictions that have found residency with a divorced noncustodial parent in similar situations.  <u>See</u>, <u>e.g.</u>, <u>Canfield v. Peerless Insurance Co.</u>, 692 N.Y.S.2d 562, 563 (N.Y. App. Div. 1999) (holding that a regular schedule of visitation coupled with the child's keeping personal items at her father's home was a "sufficient degree of permanency to establish that she was a resident of that household as a matter of law"); <u>see</u> <u>also</u> <u>Estate of Adams v. Great American Insurance Companies</u>, 942 P.2d 1087, 1091 (Wash. Ct. App. 1997) (holding child a resident of her father's home because "the child regularly spen[t] time in the household in question, such that there exist[ed] a continuing expectation of the child's periodic return on intervals regular enough that the household [wa]s the child's home during the time the child [wa]s there, as opposed to a place of infrequent and irregular visits").  The facts in <u>Canfield</u> are strikingly on point with those present here: a child bitten by a dog in the home of her father, while visiting as part of a regular custody arrangement.  <u>Canfield</u>, 692 N.Y.S.2d at 562.  We agree with that court's statement that "the child of divorced parents can be a resident of both her mother's and her father's home for the purpose of being insured under the homeowner's policy of each parent."  <u>Id.</u> at 563.  Unfortunately, in the question of residency, "[t]here is no

bright line test." Estate of Adams, 942 P.2d at 1091. However, the circumstances before us, when applied to uncontested facts, yield but one result.

Nor do we believe our holding is contrary to what we have called "the general principle favoring broad coverage." Carrera, 577 A.2d at 983. The principle we acknowledged in Carrera has been described as one of "universal recognition" and can be summarized as follows:

> "[W]here the policy provision under examination relates to the inclusion of persons other than the named insured within the protection afforded, a broad and liberal view is taken of the coverage extended. But, if the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied." Mazzilli v. Accident & Casualty Insurance Co. of Winterthur, Switzerland, 170 A.2d 800, 804 (N.J. 1961) (citing Cal-Farm Insurance Co. v. Boisseranc, 312 P.2d 401, 405 (Cal. Dist. Ct. App. 1957)); see also 9A Couch on Insurance 3d § 128:6 at 128-15 (noting that "resident" is one of several insurance terms "given their broad meaning in cases involving the extension of liability coverage and * * * construed narrowly in those cases involving exclusion from coverage").

We believe that our holding in this case is consistent with the purpose of homeowner's policies, which is to protect against claims from outsiders, and not for intrafamily injuries.[11] 9A Couch on Insurance 3d § 128:2 at 128-7 ("[T]he intent of homeowner's * * * liability policies is to protect the insured, as defined by the policy, against the risk of liability for injuries suffered by others, not injuries suffered by the insured.").

---

[11] Though we agree with defendants that finding collusion on this particular claim is absurd, policy exclusions, like the one at issue here, do generally "serve the important policy of preventing collusion among family or household members in filing claims." 9A Steven Plitt et al., Couch on Insurance 3d § 128:3 at 128-9 (2005).

- 16 -

**IV**

**Conclusion**

For the reasons set forth above, we affirm the grant of declaratory judgment for the plaintiff, Peerless Insurance Company. The papers in the case may be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

---

**TITLE OF CASE:**    Peerless Insurance Company v. Denise Luppe.

Peerless Insurance Company v. Christopher Henderson.

**CASE NO:**    No. 2014-99-Appeal.
(WC 12-17)

No. 2014-100-Appeal.
(WC 12-17)

**COURT:**    Supreme Court

**DATE ORDER FILED:**    June 17, 2015

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Kristin E. Rodgers

**ATTORNEYS ON APPEAL:**

For Plaintiff:   John D. Hughes *(Pro Hac Vice)*

For Defendants:   Mark B. Morse, Esq.
Gregory P. Massad, Esq.